

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 21 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SCIENTIFIC-ATLANTA, INC. a Georgia corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:99-CV-1671-WBH |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| STARSIGHT TELECAST, INC. a California corporation, | ) ) ) | |
| Defendant. | ) ) | |

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY RELIEF

Plaintiff Scientific-Atlanta, Inc. ("S-A") for its Complaint against

Defendant StarSight Telecast, Inc. ("StarSight"), hereby demands a jury trial and

alleges the following:

### NATURE OF ACTION

1.

This is an action in which S-A seeks a declaratory judgment that

United States Patents Number 4,706,121 and 5,479,268 (collectively, "the Patents-



in-Suit") are invalid, unenforceable and/or not infringed by S-A, either directly or as an inducing or contributory infringer.

## **THE PARTIES**

2.

S-A is a corporation organized under the laws of the State of Georgia, having its principal place of business at One Technology Parkway, South, Norcross, Georgia. S-A is engaged in the business of designing, manufacturing and selling equipment for use in the cable communications industry. S-A's line of products includes, among others, cable television set-top converter terminals which may be used by television viewers to receive and unscramble cable television transmissions so that the transmissions may be used by the viewer's television set. S-A's set-top converter terminals allow viewers to watch cable television programs, and also provide or enable the use of many additional features. One such feature is the display and use of an interactive electronic program guide ("EPG"), which may be used by a viewer to ascertain and select the viewer's choice of available television programming.

- 2 -

3.

On information and belief, StarSight is a California corporation with its principal place of business at 39650 Liberty Street, Fremont, California. Defendant StarSight is engaged in the business of marketing and selling interactive EPGs, and is the record owner of the Patents-in-Suit. On information and belief, StarSight has been acquired by and is operating as a wholly-owned subsidiary of Gemstar International Group, Limited, a British Virgin Islands corporation.

## JURISDICTION AND VENUE

4.

This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337, 1338, and 1367. Upon information and belief, StarSight is doing business in the State of Georgia and in this Judicial District. Upon information and belief, personal jurisdiction exists over StarSight by virtue of StarSight's acts and the acts of StarSight's agents, pursuant to the Georgia long-arm statute, O.C.G.A. §9-10-91. Venue in this district is proper under 28 U.S.C. § 1391.

## BACKGROUND

### 5.

In October 1992, before StarSight was acquired by Gemstar International Group Limited, StarSight and S-A entered into a License and Technical Assistance Agreement (the "1992 License Agreement") relating to the development of software that would allow StarSight's interactive EPG to be displayed on S-A's cable set-top converter. The 1992 License Agreement granted S-A the right to use StarSight's patents, including its U.S. Patent No. 4,706,121 entitled "TV Schedule System and Process" (the '121 patent), and certain StarSight confidential information in developing the StarSight guide.

### 6.

A dispute arose under the 1992 License Agreement. In April 1995, StarSight commenced an arbitration, styled *StarSight Telecast, Inc. and Scientific-Atlanta* AAA Case No. 74-E133-0416-95, under the auspices of the American Arbitration Association in San Francisco, California. StarSight alleged that S-A breached the 1992 License Agreement by failing to deliver the EPG software promised in the 1992 License Agreement by the target date and by improperly

- 4 -

utilizing StarSight's confidential information in developing competing EPG software.

7.

In February 1996, S-A instituted suit against StarSight and one of its licensees in the United States District Court for the Northern District of Georgia for infringement of 3 of S-A's patents:  U.S. Patent 4,991,011, entitled "Interactive Television Terminal With Programmable Background Audio or Video"; U.S. Patent 5,477,767, entitled "method and Apparatus for Providing an On Screen User interface for a Subscription on Television Terminal"; and U.S. Patent 5,247,364, entitled "Method and Apparatus for tuning Data Channels in a Subscription television System Having In-Band Transmissions."

8.

The arbitration between StarSight and S-A was concluded on July 23, 1996, with the issuance of an Arbitral Award in favor of StarSight (the "Award"). Under the terms of the Award, S-A was enjoined for a period of three years from shipping to third parties any consumer product incorporating an interactive EPG, except that S-A was permitted to fulfill any orders for its 8600x EPG product for which it was already committed as of the July 23, 1996 date.  S-A was free to

- 5 -

redevelop an EPG in a "clean room" environment. The Award made clear, however, that StarSight could seek redress in the courts for any alleged patent infringement occurring after the date of the Award.

9.

After conclusion of the arbitration, and in order to resolve differences then existing between S-A and StarSight (including S-A's patent infringement action against StarSight then pending in the Northern District of Georgia, S-A's appeal to the United States Court of Appeals for the Ninth Circuit for a portion of the Award, and a second arbitration proceeding commenced by StarSight under the 1992 License Agreement), S-A and StarSight entered into a License and Settlement Agreement on April 3, 1997 (the "1997 StarSight Agreement"). In accordance with the 1997 StarSight Agreement, S-A was granted a nonexclusive, worldwide right and license until July 22, 1999, under certain StarSight Patents, including the Patents-in-Suit.

10.

In May 1997, StarSight was acquired by Gemstar International Group, Limited, a company which also conducts EPG business through Gemstar

- 6 -

Development Corporation (collectively, "Gemstar"). On information and belief, StarSight continues to operate as a wholly-owned subsidiary of Gemstar.

11.

The 1997 StarSight Agreement obligated StarSight to develop a version of its StarSight "full" EPG for S-A's new digital set-top box (the Explorer 2000 Digital HCT Product) within 180 days after S-A requested the EPG in accordance with the terms of the 1997 StarSight Agreement. S-A gave the required notice and satisfied the contract conditions on December 8, 1998, thereby obligating StarSight to deliver a StarSight EPG product for S-A's digital set-top by June 8, 1999. StarSight has not delivered the StarSight EPG product to S-A as required by the 1997 StarSight Agreement.

12.

Instead of delivering the EPG product on June 8, 1998, StarSight chose to file an anticipatory lawsuit against S-A in Denver, Colorado on May 6, 1999 alleging, *inter alia*, that S-A is in breach of the 1997 Agreement and that StarSight is excused from providing the EPG that it had promised in the 1997 StarSight Agreement. StarSight Telecast, Inc. v. Scientific-Atlanta, Inc., No. 99-M-891 (D.C. Colo. filed May 6, 1999).

- 7 -

13.

In its May 6 Colorado Complaint, StarSight alleges that S-A has failed to pay royalties as required under the 1997 StarSight Agreement. The 1997 StarSight Agreement requires S-A to pay royalties for all S-A products covered by the StarSight licensed patents, which include the Patents-in-Suit. StarSight sought an accounting for these royalties allegedly owed to StarSight. Further, StarSight asked for injunctive relief which may only be requested upon a Material Breach of the 1997 Agreement by S-A. StarSight has the right to revoke, unilaterally and at any time, S-A's license to the Patents-in-Suit upon a "Material Breach" by   S-A.

14.

On May 17, 1999, StarSight filed an Amended Complaint in the United States District Court for the District of Colorado that removed the "Fourth Claim for Relief" (accounting of royalties owed by S-A), but maintained under the General Allegations a request for an accounting of royalties owed by S-A to StarSight under the 1997 Agreement and the injunctive relief which may only be due under a Material Breach of the 1997 Agreement.

15.

On June 1, 1999, S-A answered StarSight's Colorado suit on the 1997 StarSight Agreement, denying any breach by S-A and asserting a counterclaim against StarSight for the breach of the 1997 StarSight Agreement.

16.

The 1997 StarSight Agreement will expire on July 22, 1999.

17.

In anticipation of the expiration of the 1997 StarSight Agreement, S-A sought to engage in discussions concerning the StarSight and Gemstar patents. During these discussions, Gemstar took unreasonable positions and sought to impose unreasonable conditions to any further licenses of StarSight or Gemstar patents. On December 2, 1998, Gemstar effectively terminated any possibility of a non-litigated resolution by demanding S-A pay Gemstar a "nonrefundable" $20 million payment for alleged "past infringements," regardless of any future licenses for StarSight or Gemstar patents.

18.

Since its acquisition of StarSight, Gemstar has continued to engage in a pattern of litigation to enforce its claimed patent rights in patents it already owned or acquired from third parties. On July 24, 1998, Gemstar and StarSight

- 9 -

filed Gemstar Development Corp., et al. v. Prevue Networks, Inc., et al., No. C98-20778 RMW (D.C.N.D. Cal.) which alleges infringement of United States Patent Number 4,706,121, one of the Patents-in-Suit.   Then, during late November - early December 1998 Gemstar filed two more suits against third parties based on other patents acquired from third parties (but not the Patents-in-Suit):   Gemstar Development Corp. et al. v. General Instrument Corp., No. 3:98-4561 (D.C.N.D. Cal. filed on November 30, 1998); and Gemstar Development Corp., et al. v. Pioneer Electronic Corp., et al., No. 2:98-9630 (D.C.C.D. Cal. filed on December 1, 1998).

19.

Reasonably anticipating that it was about to be sued,  S-A filed a suit against Gemstar, styled Scientific-Atlanta, Inc. v. Gemstar International Group Limited, et al., No. 1:98-CV-3477 (D.C.N.D. Ga. filed on December 3, 1998), for violations of the antitrust laws and seeking, among others, declaratory judgments that S-A's products do not infringe certain of Gemstar's patents that were not licensed to S-A under the 1997 StarSight Agreement (the "Gemstar patents").

20.

The following day, December 4, 1998, Gemstar actually did file suit against S-A, alleging infringement of two of the Gemstar patents.  Gemstar Development Corp. v. Scientific-Atlanta, Inc., No. 98-9781DDP-RZX (D.C.C.D. Cal. filed on December 4, 1998).

21.

In press releases (attached hereto as Exhibit "A") announcing the filing of several of Gemstar's patent infringement suits, Dr. Henry C. Yuen, chief executive officer of Gemstar, affirms Gemstar's "policy of vigorously enforcing its intellectual property . . . to the fullest extent of the law."

## THE CURRENT SITUATION

22.

As a result of Gemstar's and StarSight's conduct, all potential license negotiations have broken down.  This is disrupting and creating uncertainty in the continued marketing and shipment of S-A's analog set-tops and in the introduction and market penetration of S-A's advanced digital Explorer 2000 system, and causing irreparable damage to S-A's current business interests.

- 11 -

23.

Since December 4, 1998, there have been no significant discussions between S-A and Gemstar or StarSight concerning renewal of the 1997 StarSight Agreement. S-A has been unable to obtain assurances or even responses to its inquiry as to whether existing customers for the licensed product sold by S-A will be permitted to license or purchase compatible set-top boxes for their existing systems. StarSight has also failed to provide the new EPG for the S-A product as required by the 1997 StarSight Agreement.

24.

StarSight's intention to enforce its patents by litigation and to insist on the collection of royalties for the Patents-in-Suit has been reinforced by a recent letter sent by StarSight to S-A demanding that an accounting firm analyze S-A's financial records so that an accounting of royalties may be had.

25.

For the reasons set forth here, S-A believes that the Patents-in-Suit are invalid or not infringed by S-A even though they are covered by the 1997 StarSight Agreement which will expire on July 22, 1999.

26.

StarSight's failure to deliver an alternative working StarSight guide to S-A by June 8, 1998, prevents S-A from making commitments to its customers for delivery of a licensed StarSight guide after the expiration of the current license, placing these activities under the cloud of the alleged infringement of the Patents-in-Suit. The delivery of the StarSight guide on June 8, 1998, under the 1997 StarSight Agreement would have provided S-A with a licensed guide to sell to customers with its set-top boxes.

27.

Based on the totality of the circumstances here presented, and in light of the clear history and proclivity for litigation demonstrated by StarSight and Gemstar, S-A is reasonably apprehensive that StarSight intends to enforce the Patents-in-Suit by litigation against S-A and intends to file a patent infringement suit against S-A relating to the Patents-in-Suit.

28.

S-A reasonably believes that an actual, immediate and justiciable dispute exists between StarSight and S-A regarding the Patents-in-Suit. S-A is

currently threatened with imminent litigation regarding the applicability of the Patents-in-Suit to S-A's products.

## COUNT 1

### Invalidity and Non-Infringement of United States Patent 4,706,121

29.

S-A has not infringed, and is not infringing, United States Patent number 4,706,121 (as modified by reexamination certificate B1 4,706,121) ("the '121 Patent") directly, contributorily, or by inducement.

30.

The '121 Patent (as amended in reexamination) is invalid for failure to meet the requirements of 35 U.S.C. §§101 et seq. (including, but not limited to, §101, §102, §103, §112), and on information and belief, StarSight knows or should know that certain claims in the '121 Patent are invalid and/or that S-A does not infringe the '121 Patent.

31.

Patrick Young ("Young") is named as the original inventor and patentee of the '121 Patent. Young assigned the '121 Patent to Insight Telecast,

- 14 -

Inc. (StarSight's predecessor), which subsequently assigned the '121 Patent to StarSight.

32.

Statements and amendments made by StarSight during the prosecution of the '121 Patent, and its reexamination certificate, preclude a finding that S-A has infringed, or is infringing, the '121 Patent directly, contributorily, or by inducement.

33.

The '121 Patent is unenforceable by reason of StarSight's and/or the patentee's inequitable conduct before the United States Patent and Trademark Office ("U.S.P.T.O.") during prosecution of the application for the original '121 Patent and during the reexamination proceeding that resulted in the '121 reexamination certificate. StarSight's inequitable conduct includes, but is not limited to, the following instances:

(a) On information and belief, Young knew, or should have known, that the various features of claims relied upon by the Examiner were already known in the art. For example, the claim 12 feature relied upon by the Examiner for patentability was

- 15 -

already known in the art before the original application (and the amended claim 1) issued into the '121 Patent. On information and belief, Young has admitted that this prior art was material to the Examiner's consideration of claim 12, and that he had "no idea" whether the Examiner knew of this prior art. The fact that the Examiner stated that claim 1 (with 10) would be patentable if it also included the claim 12 watch one/record another feature, and that the Examiner cited no prior art disclosing this feature, establishes that the Examiner did not know of such prior art.

(b)     On information and belief, StarSight and Young accepted allowance of the amended claim 1 (and its dependent claims) while withholding, with knowledge and deceptive intent, prior art that was materially relevant to the patentability of amended claim 1.

(c)     By amending claim 1 to include the features of claims 10 and 12, and then arguing the patentability of the resulting claim, StarSight acquiesced in the Examiner's rejection. On

information and belief, this acquiescence was due to the fact

that Young, his patent attorney (Willis Higgins), and

StarSight's President (Michael Faber) all agreed with the

Examiner.  StarSight's acquiescence was, in fact, an admission

that the Examiner was correct in his rejection of claims 1 and

10.

(d)     On information and belief, Young, Faber, and Higgins all knew,

or should have known, that Krüger discloses to persons of

ordinary skill in the art the broadcast, storage and use of future

schedule information.

(e)     In addition, StarSight learned that a patent application owned

by Michael Levine was going to issue as a patent.  StarSight

attempted to bring the Krüger reference to the attention of the

Examiner in charge of the Levine application, as well as

Levine's patent attorney (Alan Krass).  On information and

belief, Young, Faber and Higgins wrote a letter, dated February

9, 1990, to the Examiner of the Levine application (Examiner

McElheny), but that letter arrived too late to be considered by

Examiner McElheny before the Levine patent issued.  In the February 9 letter, StarSight informs Examiner McElheny that Krüger discloses a guide with the broadcast, storage and use of future schedule information to record programs in the future.

(f)     Faber also wrote a letter, dated February 16, 1990, to Alan Krass.  In this letter, which was copied to Higgins, Faber discusses how Young realized the prevalence of prior art in the field of television schedules.  Faber states that the Krüger patent was related to a German system in which literally every VCR downloaded future television schedules for program recording.

(g)     On information and belief, on March 18, 1991, Higgins, on behalf of Young and StarSight, also admitted to a different patent Examiner of another Young patent, that Krüger discloses the use of future television schedule information for unattended recording of television programs using a VCR.

(h)     On December 6, 1991, TV Answer, Inc. filed a request for reexamination of the original issued '121 Patent.  Young, Faber, and a new patent attorney, Eric Willgohs, were active in

the reexamination. Higgins also participated in the early stages of the reexamination. On information and belief, none of Higgins, Young, or Faber informed Willgohs of StarSight's prior admissions to Examiner McElheny and Krass regarding Krüger's disclosure of broadcast, storage, and usage of future schedule information, or of its use in recording future programs.

(i)     In the reexamination request, TV Answer asserted that StarSight admitted that patentability of claim 1 lay in the watch one/record another feature found in originally filed claim 12.

(j)     On June 8, 1992, the reexamination Examiner rejected all of the '121 claims, citing Krüger as the primary reference for rejecting, among others, claim 1.

(k)     With the assistance of Young and Faber, Willgohs prepared a response to the Examiner's rejection. The response was filed on August 13, 1992, and alleged that the claim 1 term "schedule information" required information pertaining to future programs. The response further alleged that Krüger did not disclose this type of "schedule information" because Krüger

- 19 -

only provided program information relating to a program
currently being broadcast.

(l)     StarSight's August 13 response was effective in convincing the
reexamination Examiner to drop the rejections that were based
on Krüger.

(m)     Upon information and belief, Faber and Young knew, or should
have known, that the August 13 response contained false and/or
misleading statements regarding Krüger.  Faber and Young also
knew or should have known, on information and belief, that
these statements contradicted StarSight's admission by
acquiescence that Krüger anticipated the original claim 1
features, including the "schedule information" limitation.

(n)     StarSight's prior admissions to the U.S.P.T.O. and to Krass
regarding Krüger, and Faber's, Young's and Higgins'
understanding of Krüger, constitute material information that
was withheld from the U.S.P.T.O. during the reexamination.

(o)     On information and belief, StarSight, with deceptive intent,
intentionally withheld its prior admissions regarding Krüger,

- 20 -

and Faber's, Young's and Higgins' understanding of Krüger, in order for the Examiner to accept StarSight's mischaracterization of Krüger.

(p)   Prior to the '121 Patent reexamination, Gemstar Development Corporation developed and marketed a remote control VCR product known as "VCR Plus+." VCR Plus+ allowed users to enter numeric codes printed in published television listings to program a VCR for future recording.

(q)   On information and belief, in 1990, Young and Higgins analyzed the VCR Plus+ product, and concluded that it infringed claims 36 and 51 of the original '121 Patent.

(r)   On information and belief, in August and September of 1990, StarSight wrote to Gemstar Development Corporation, charging that VCR Plus+ infringed claims 36 and 51 of the original '121 Patent. S-A is also informed and believes that StarSight obtained a written opinion, from Higgins, that VCR Plus+ infringed the '121 Patent, and that StarSight publicized the infringement by sending letters and/or copies of the Higgins

- 21 -

infringement opinion to Gemstar Development Corporation's counsel as well as major newspapers.

(s)   In the reexamination, StarSight submitted a sworn declaration by Young, dated August 13, 1992 in support of the original '121 Patent claims, including claims 36 and 51. On information and belief, StarSight submitted the declaration to convince the reexamination Examiner that the StarSight '121 patent represented a successful, and therefore patentable, solution to the VCR programming problem while other products that did not use the '121 Patent claims, particularly VCR Plus+, were failed attempts by others to solve the VCR programming problem.

(t)   StarSight did not tell the U.S.P.T.O. that it had earlier stated that the VCR Plus+ system was so similar to the '121 Patent system that the VCR Plus+ system infringed the claims of the original '121 Patent. StarSight also failed to reveal that it had received the Higgins opinion indicating that the VCR Plus+ system infringed the '121 Patent.

- 22 -

(u)     On information and belief, Young and Faber never informed Willgohs about the charge of infringement or of the Higgins opinion regarding VCR Plus+.

(v)     StarSight also never informed the U.S.P.T.O. that the VCR Plus+ system, which was alleged to be an inferior attempt at solving the VCR programming problem, had actually sold millions of units, while StarSight's guide had achieved little or no commercial success.

(w)     StarSight's charge of infringement of the '121 Patent against Gemstar regarding the VCR Plus+ system, Higgins' opinion of infringement of the '121 Patent by VCR Plus+, Young's and Faber's belief that VCR Plus+ actually infringed the '121 patent, and the relative success of the VCR Plus+ system, as compared to the StarSight guide's lack of success, constitute material information that StarSight withheld from the U.S.P.T.O. during the '121 reexamination.  This information is inconsistent with, and directly refutes, positions taken by StarSight in Young's sworn declaration arguing patentability.

- 23 -

(x)    StarSight's opinion that VCR Plus+ infringed, and its VCR Plus+ charges of infringement, were also directly contrary to StarSight's arguments to the reexamination Examiner concerning the accepted meaning of "program schedule information." StarSight represented and argued to the Examiner that the accepted meaning of this term required all three of time, title and channel of a program. The VCR Plus+ opinion of infringement and charges of infringement show a contrary interpretation, one that did not require program title as part of "program schedule information."

(y)    On information and belief, StarSight withheld material information concerning VCR Plus+ with deceptive intent.

(z)    StarSight failed to comply with its duty of candor and good faith toward the U.S.P.T.O. during prosecution of the reexamination of the '121 Patent by submitting a sworn declaration containing false and misleading information and omitting other material information.

- 24 -

(aa)   A Request for Reexamination of the '121 Patent was filed on December 6, 1991.  On June 8, 1992, the U.S.P.T.O. issued an office action rejecting certain claims of the reexamination application.  Responsive to that rejection, on August 10, 1992, StarSight and Young (collectively, "Applicant") filed an amendment to the claims and provided arguments challenging the outstanding rejection.  Additionally, Applicant simultaneously filed a declaration in which Applicant asserted that the rejection was incorrect, in part, because his invention addressed a long-felt need in the technology and was, therefore, nonobvious.

(bb)   At the time Applicant submitted responsive arguments and filed the declaration, Applicant knew of documents in Applicant's possession which contradicted Applicant's assertion that the claimed invention was the first to address problems associated with future programming and the first to use "point and select" techniques to do so.  Prior to the reexamination of the '121 Patent, Applicant commissioned and received a detailed report

- 25 -

informing Applicant that several VCR models in use in Germany prior to the earliest effective date of his patent utilized the "point-and-select" method of programming. Applicant understood the materiality of such information as evidenced by the fact that Applicant attempted to distinguish his claimed invention from other prior art on the basis that this feature was lacking. Applicant further understood that the submission of false or misleading statements in a declaration was a material act that would render Applicant's patent unenforceable.

(cc)   Moreover, prior to the issuance of the Reexamination Certificate for the '121 Patent, Applicant knew of additional material information relating to the use of cursor type "point and select" techniques in the CableData system and the SuperGuide system prior to the effective date of the '121 Patent, but failed to disclose such material information to the U.S.P.T.O. during the prosecution of reexamination of the '121 Patent, despite Applicant's affirmative obligation to do so under 37 C.F.R. §§ 1.56 and/or 1.555.

(dd)   Applicant knew that statements contained in the sworn

declaration were inconsistent with information contained in

documents within Applicant's possession and that such

information was, therefore, material to the prosecution of the

reexamination of the '121 Patent.  Applicant knew that

Applicant's failure to disclose information within Applicant's

possession that tended to contradict statements by Applicant

was material to the prosecution of the reexamination of the '121

Patent and should have been disclosed to the U.S.P.T.O.

Applicant understood the materiality of such information as

evidenced by the fact that Applicant distinguished the claimed

invention from other prior art on the basis that this feature was

lacking.  On information and belief, Applicant's submission of

a misleading declaration and Applicant's failure to disclose

contradictory information was done with an intent to mislead

the U.S.P.T.O.

(ee)   U.S. law requires that a patent must be granted in the name of

the true and correct inventor(s).  When there is joint

inventorship, any patent must issue to all inventors.  Non-joinder -- *i.e.*, the failure to add a joint inventor -- may render a patent unenforceable.

(ff)   Information relating to inventorship is material to the patentability of a claimed invention under 35 U.S.C. § 102(f). Because of the patentability implications, information relating to inventorship and possible unnamed co-inventors is material information that should be disclosed to the examiner under a patent applicant's duty of disclosure under 37 C.F.R. § 1.56. The examiner typically has no independent avenue for learning this information, and the unnamed inventor typically has no notice that an application has been filed on his/her invention.

(gg)   When Young initially sought a patent on the invention claimed in the '121 Patent, he considered the invention a joint invention of himself and Ed Neil.  This is evident from Young's own initial contemporaneous writings relating to the invention. Moreover, in discussing Ed Neil's inventive contribution with his attorney, Young indicated that Ed Neil contributed the idea

- 28 -

of providing a system that allowed a television viewer "to select television programs to be viewed without a manual search of published program listings," wherein the system would remember what programs the viewer wished to view.

(hh)   Despite their concerns that Ed Neil should be named as an inventor in the '121 Patent application, during the original prosecution of the '121 Patent, neither Young nor his patent attorney Higgins (nor anyone else) advised the patent examiner of any of Neil's contributions to the invention.  To the contrary, during prosecution of the '121 Patent, Young signed two sworn declarations indicating that he believed he was the "original, first and sole inventor" of the subject matter for which he sought a patent.  Additionally, neither Young nor Higgins (nor anyone else) advised the examiner of Neil's contributions to the invention during the reexamination of the '121 Patent.

(ii)   Because of the potential effect on the patentability of the '121 Patent claims under 35 U.S.C. § 102(f), Young or his attorney (Higgins) should have disclosed information concerning Ed

Neil's inventive contribution to the examiner in compliance with their duty of disclosure under 37 C.F.R. § 1.56. Young and Higgins had an obligation to disclose Neil's contributions so that the examiner could determine in the first instance whether Neil's contributions required Neil's joinder as a co-inventor. Because the examiner had no independent way of finding out about Ed Neil's contributions to the invention, Young's and Higgins' intentional withholding of this information from the examiner demonstrates an intent to mislead the examiner. At the very least, even if Young had felt the inventive contribution of Neil did not reach the level of patentability, Young or StarSight should have submitted Neil's portion of the contribution as prior art because Young was not himself the inventor.

(jj)   Young and Higgins committed inequitable conduct by intentionally withholding all information from the examiner relating to Ed Neil's contributions to the invention claimed in

the '121 Patent. This inequitable conduct renders the '121

Patent unenforceable.

34.

The '121 Patent is unenforceable for nonjoinder of an actual inventor in

violation of 35 U.S.C. § 102(f).

35.

In light of the ruling of the International Trade Commission that Ed Neil is

an actual inventor of the '121 Patent, S-A took an assignment from Mr. Neil of his

interest in the '121 Patent. Accordingly, S-A is an owner of the '121 Patent by

virtue of the assignment of the interest of Ed Neil, an actual inventor of the '121

Patent, to S-A as evidenced by the assignment attached hereto as Exhibit "B."

## COUNT 2

### Correction of Ownership in the
### United Sates Patent and Trademark Office

36.

Ed Neil is an actual inventor of the '121 Patent.

37.

In light of the ruling of the International Trade Commission that Ed Neil is

an actual inventor of the '121 Patent, S-A took an assignment from Mr. Neil of his

interest in the '121 Patent. Accordingly, S-A is an owner the '121 Patent by virtue of the assignment of the interest of Ed Neil to S-A, as evidenced by the assignment attached hereto as Exhibit "B."

38.

S-A is therefore entitled to a Court Order directing the United States Patent and Trademark Office to issue a certificate to correct inventorship, namely to reflect that Ed Neil is an actual inventor of the '121 Patent.

## COUNT 3

## Invalidity and Non-Infringement of United States Patent 5,479,268

39.

S-A has not infringed, and is not infringing, United States Patent Number 5,479,268 ("the '268 Patent") directly, contributorily, or by inducement.

40.

The '268 Patent (as amended in reexamination) is invalid for failure to meet requirements of 35 U.S.C. §§101 et seq. (including, but not limited to, §§ 101, 102, 103, 112).

41.

The '268 Patent was issued to Patrick Young, John H. Roop, Allan R.

Ebright, Michael W. Faber, and David Anderson as inventors, and was originally

assigned to StarSight.

42.

Statements and amendments made by StarSight during the prosecution of the

'268 Patent, and its reexamination certificate, preclude a finding that S-A has

infringed, or is infringing, the '268 Patent directly, contributorily, or by

inducement.

43.

The '268 Patent is unenforceable by reason of Applicant's inequitable

conduct before the U.S.P.T.O. during prosecution of the application for the '268

Patent.  Applicant's inequitable conduct includes, but is not limited to, the

following instances:

> (a)     Applicant violated the duty of candor by withholding from the
>
> U.S.P.T.O. disclosure of relevant prior art, including, but not
>
> limited to, information and publications related to the Easy
>
> Guide System.

- 33 -

(b)     The inventors of the Easy Guide System provided a
        demonstration, documents, and an associated business plan
        describing the Easy Guide System to Viacom.  Viacom was a
        major shareholder of StarSight.

(c)     Applicant was provided with this information concerning the
        Easy Guide System, but never conveyed this information to the
        U.S.P.T.O.

(d)     Applicant and its counsel knew of, or should have known of,
        the existence of the Easy Guide System and its materiality to
        the patentability of the '268 Patent.

(e)     On information and belief, Applicant and its counsel withheld
        material information concerning the Easy Guide System from
        the U.S.P.T.O. with deceptive intent.

## COUNT 4

### Patent Misuse

44.

StarSight is barred by the equitable doctrine of patent misuse from enforcing

the Patents-in-Suit against S-A.  StarSight has been and is presently engaged in

- 34 -

concert and conspiracy with its new parent company, Gemstar-TV Guide

International, Inc., n/k/a Gemstar T.V. Guide International, Inc. (together with

StarSight, referred to herein as "Gemstar") to carry out a pattern of continuing

misconduct that constitutes patent misuse.  Gemstar is barred by the equitable

doctrine of patent misuse from enforcing any of its IPG-related patents, including

the Patents-in-Suit, as a result of its unlawful extension of the scope and duration

of such patents through a coordinated series of abusive practices, detailed below,

that individually and together constitute patent misuse.  This pattern of misuse has

been the subject of separate judicial complaints by both Gemstar and TV Guide,

Inc. before these companies merged with StarSight in 1997 and 2000, respectively.

Gemstar has engaged in patent misuse because it has attempted to and has in fact

unlawfully extended the scope of its patent monopoly by engaging in tying

arrangements, package licensing, and other anticompetitive practices with respect

to the Patents-in-Suit.  The Patents-in-Suit are therefore unenforceable.

45.

Gemstar markets electronic program guides, interactive electronic program

guides, and related technology.  Gemstar has considerable market power in the IPG

technology licensing market, in accordance with 35 U.S.C. § 271(d).

- 35 -

46.

Without limiting the generality of the broad misuse asserted herein, and

subject to such other or additional facts, information, and abusive conduct as may

be shown during the course of discovery, S-A asserts that enforcement of any of

StarSight's IPG technology patents, including the Patents-in-Suit, are barred until

purged of the misuse committed in the ways set forth below.

47.

Gemstar has misused the Patents-in-Suit by conditioning licenses under the

patents on the requirement that royalty payments be made under the licenses on

patents which Gemstar knows or reasonably should know are invalid under 35

U.S.C. §§102, 103, and/or 112.

48.

Gemstar has misused its IPG-related patents, including the Patents-in-Suit,

by conditioning licenses to its IPG patents on the licensee's agreement to also

purchase Gemstar's separate IPG product.

49.

Gemstar has misused its IPG-related patents, including the Patents-in-Suit,

by coercing potential licensees into entering into comprehensive package licenses.

(a)   Gemstar has considerable market power in the IPG product and IPG technology licensing markets, in accordance with 35 U.S.C. § 271(d).

(b)   Gemstar's business strategy is to coerce potential licensees into taking licenses under its entire patent portfolio rather than allowing potential licensees to negotiate licensing agreements for specific IPG-related patents.

(c)   Gemstar has conditioned licenses under the Patents-in-Suit, as well as each of them individually, on the requirement that potential licensees, including S-A, take licenses and pay royalties for other unwanted and unnecessary patents.

(d)   Gemstar has refused to license any patents individually, instead insisting on a comprehensive package license that covers every patent in Gemstar's patent portfolio.  Gemstar has refused even to discuss issues related to the asserted scope of any specific patent in Gemstar's patent portfolio.

(e)   Gemstar has refused to identify all of the patents in its asserted IPG patent portfolio.  Gemstar asserts to potential licensees

- 37 -

that, as a result of Gemstar's complex corporate structure,

potential licensees will not be able to identify all IPG patents

within Gemstar's control.  Gemstar therefore asserts that

potential licensees can protect themselves from protracted

litigation only by agreeing to license Gemstar's entire portfolio

of patents, including the unidentified patents.

(f)   Accordingly, Gemstar's package licensing activity constitutes

patent misuse, and its asserted IPG-related patents, including

the Patents-in-Suit (as well as each patent individually), are

unenforceable.

50.

Gemstar has misused its IPG-related patents, including the Patents-in-Suit,

by engaging in a tying arrangement in which Gemstar prohibits actual or potential

licensees from taking a license for Gemstar's IPG patents or product without also

agreeing to accept advertising capability according to Gemstar's specifications; to

carry unpatented, separable, advertising information supplied by Gemstar; and to

rely on Gemstar's IPG advertising sales services.

(a)    Gemstar has considerable market power in the IPG product and IPG technology licensing markets, in accordance with 35 U.S.C. § 271(d).

(b)    In license negotiations and agreements with certain actual or potential licensees, in order for licensees to be able to obtain a license for Gemstar's IPG patents or product, the licensees must also agree to implement an IPG that includes advertising capability and to modify their existing IPG products to include such advertising capability.

(c)    Further, in order for licensees to be able to obtain a license for Gemstar's IPG patents or product, Gemstar requires its licensees to include unpatented, separable, staple advertising information, supplied by Gemstar, in all of their IPG products; to rely on Gemstar's IPG advertising sales services; and to agree that Gemstar would be entitled to receive the vast majority (approximately 85% in some cases) of any advertising revenue.

- 39 -

(d)     Therefore, under Gemstar's arrangement, licensees are denied a
license to Gemstar's IPG product or technology if they desire
Gemstar's IPG without such advertising capability or
advertising information, or if they wish to sell IPG advertising
themselves.

(e)     Accordingly, Gemstar's tying arrangement is an unlawful
extension of Gemstar's patent rights respecting various IPG
technologies into separate products and services of advertising
on IPGs and advertising sales services and constitutes patent
misuse.  As a result, Gemstar's asserted IPG-related patents,
including the Patents-in-Suit (as well as each patent
individually), are unenforceable.

51.

Gemstar has misused its IPG-related patents, including the Patents-in-Suit,
by engaging in a tying arrangement in which Gemstar conditions a license to its
IPG product or patents on the licensee's agreement to also use Gemstar's program
listings data.

- 40 -

(a)   Gemstar has considerable market power in the IPG product and IPG technology licensing markets, in accordance with 35 U.S.C. § 271(d).

(b)   In license negotiations and/or agreements with certain actual or potential licensees, Gemstar has insisted that licensees of Gemstar's IPG product or patents also use Gemstar's program listings information that is displayed on the IPG.

(c)   Accordingly, Gemstar's tying arrangement is an unlawful extension of its patent rights respecting various IPG technologies into the separate product of program listings data feeds and constitutes patent misuse. As a result, Gemstar's asserted IPG-related patents, including the Patents-in-Suit (as well as each patent individually), are unenforceable.

52.

Gemstar has misused its IPG-related patents, including the Patents-in-Suit, by coercing one or more licensees of its patents to agree to long-term contracts and to use Gemstar's IPG product exclusively or nearly exclusively for the duration of

the contract, thereby precluding the licensee from making, selling, or using other potentially non-infringing IPGs that would compete with Gemstar's IPG product.

(a) Gemstar has considerable market power in the IPG product and IPG technology licensing markets, in accordance with 35 U.S.C. § 271(d).

(b) Gemstar has insisted that substantially all of its licensees of its patents agree to exclusive or nearly exclusive contracts of up to twenty years in duration by conditioning their waiver of their right to sue for past infringement on acceptance of these terms, by threatening to cut off their current IPG service, and by offering significant economic incentives for the licensees' commitment to use Gemstar's IPG exclusively or nearly exclusively for the duration of the contract.

(c) The effect of Gemstar's long-term and exclusive license agreements has been and will be to foreclose competition in the markets for IPG technology and products.

(d) Accordingly, Gemstar's practice of coercing licensees of its patents to agree to long-term and exclusive contracts constitutes

- 42 -

patent misuse, and Gemstar's asserted IPG-related patents,

including the Patents-in-Suit (as well as each patent

individually), are unenforceable.

53.

Gemstar has misused its IPG-related patents, including the Patents-in-Suit,

by forcing its actual licensees and demanding its potential licensees to enter

agreements containing explicit grantback provisions and a promise by the licensees

not to assert any of the licensee's patents against Gemstar or licensees of Gemstar,

generally for an indefinite duration.  Such provisions allow Gemstar unlawfully to

extend its IPG patents and receive value for the "non-assertion" of its licensees'

IPG-related patents.

(a)    Gemstar has considerable market power in the IPG product and

IPG technology licensing markets, in accordance with 35

U.S.C. § 271(d).

(b)    Gemstar's grantback and non-assertion provisions restrict, if

not eliminate, competition in the licensing of IPG technology

and products in the United States by allowing Gemstar and its

other licensees to free ride off of any licensee's IPG technology

- 43 -

or product development costs, thereby eliminating the incentive of Gemstar's licensees to develop competing technology and products.

(c)     Gemstar insists on its licensees' acceptance of these grantback and non-assertion provisions.

(d)     Accordingly, Gemstar's practice of coercing licensees of its patents to accept the grantback and non-assertion provisions constitutes patent misuse, and Gemstar's asserted IPG-related patents, including the Patents-in-Suit (as well as each patent individually), are unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, S-A prays for judgment:

A.     Declaring that United States Patent 4,706,121 (as amended by reexamination certificate B1 4,706,121) is invalid;

B.     Declaring that United States Patent 4,706,121 (as amended by reexamination certificate B1 4,706,121) is unenforceable by reason of inequitable conduct before the United States Patent and Trademark Office during the prosecution and/or reexamination of United States Patent 4,706,121;

- 44 -

C.      Declaring that United States Patent 4,706,121 (as amended by reexamination certificate B1 4,706,121) is unenforceable for intentional nonjoinder of an actual inventor;

D.      Declaring that S-A has not infringed, and is not infringing, United States Patent 4,706,121 (as amended by reexamination certificate B1 4,706,121) directly, contributorily, or by inducement;

E.      Declaring that Ed Neil is an actual inventor of United States Patent 4,706,121 (as amended by reexamination certificate B1 4,706,121) and ordering that the United States Patent and Trademark Office issue a certificate to correct inventorship to reflect that Ed Neil is an actual inventor of the patent;

F.      Declaring that S-A is an owner of United States Patent 4,706,121 (as amended by reexamination certificate B1 4,706,121) by virtue of assignment from Ed Neil executed October 14, 2002;

G.      Declaring that United States Patent 5,479,268 (as amended by re-examination) is invalid;

H.      Declaring that S-A has not infringed, and is not infringing, United States Patent 5,479,268 (as amended by re-examination) directly, contributorily, or by inducement;

- 45 -

I.      Declaring that StarSight is barred by the equitable doctrine of patent misuse from asserting and enforcing United States Patent 4,706,121 (as amended by reexamination certificate B1 4,706,121) and United States Patent 5,479,268 (as amended by re-examination);

J.      Declaring that this case is an exceptional one; and

K.      Granting S-A such other and further relief as is just and proper, including its costs of this action.

[SIGNATURE APPEARS ON FOLLOWING PAGE]

- 46 -

This _____ day of January, 2003.

Respectfully submitted,

KING & SPALDING
Joseph R. Bankoff
      (Georgia Bar No. 036100)
191 Peachtree Street, N.E.
Atlanta, Georgia  30303-1763
(404) 572-4600

DUANE MORRIS LLP
L. Norwood Jameson
      (Georgia Bar No. 003970)
Matthew C. Gaudet
      (Georgia Bar No. 287789)
1180 West Peachtree Street
Suite 700
Atlanta, Georgia  30309-3448
(404) 253-6900

Attorneys for Plaintiff
SCIENTIFIC-ATLANTA, INC.

OF COUNSEL:

Joseph M. Potenza
Frederic M. Meeker
Steve S. Chang
BANNER & WITCOFF, LTD.
1001 G Street, N.W.
Washington, D.C.  200001-4957
(202) 508-9100

- 47 -



# EXHIBIT / ATTACHMENT

*A*

(To be scanned in place of tab)

Quicken.com - News                    http://www.quicken.com/investme....bw/19981130/a1558.htm&symbol=GM





## Lady Foot Locker

### the ultimate online selection for women

**Click Here !**

Quotes

__Investments__    __Portfolio__    __Alerts__    __Markets__    __Stocks__    __Funds__    __Columns__    __Quotes__

## Home Refinancing: Save Money With Quicken Mortgage

Symbol: GMSTF   GO   Symbol Lookup
Add GMSTF to Portfolio

**GMSTF**                                                                 66 1/8 , 0

## Gemstar Files Patent Infringement Suit Against General Instrument

Monday, November 30, 1998 09:30 PM                    Mail this article to a friend  new!

PASADENA, Calif.--(BUSINESS WIRE)--Nov. 30, 1998--Gemstar International Group Ltd. (Nasdaq:GMSTF) Monday announced that it has filed a patent infringement suit against General Instrument Inc. (NYSE:GIC) in the Federal District Court, Northern District of California.

The suit claims, among others, that General Instrument willfully infringed certain Gemstar intellectual property, specifically two of the so-called Levine patents, by virtue of General Instrument's deployment, marketing, offers to sell and sale of its cable set top boxes containing an unlicensed interactive program guide.

The Levine patents broadly cover, among others, an interactive program guide using locally stored or cached data. Gemstar is seeking an injunction and monetary damages.

"Gemstar continues its policy of vigorously enforcing its intellectual property," said Henry C. Yuen, chief executive officer of Gemstar. "Gemstar will diligently prosecute infringers of its patents, trademarks, copyrights and other intellectual property, and will seek redress to the fullest extent of the law."

Gemstar's wholly owned subsidiary StarSight Telecast Inc. is currently the petitioner in an arbitration proceeding against General Instrument claiming breach of contract by General Instrument. The contract action concerns General Instrument's willful failure to deploy StarSight-capable set-top boxes, its development of a competing electronic program guide and its misappropriation of StarSight's technology and other information in violation of General Instrument's written agreement with StarSight.

Gemstar develops, markets and licenses proprietary technologies and systems aimed at making technology user-friendly for consumers. Gemstar's technology and intellectual property are licensed to major companies in the consumer electronics, satellite, cable and personal computer industries, including Aiwa, Akai, Cox, Daewoo, Funai, GTE, Hitachi, Hughes Network Systems, JVC, LG Electronics (Goldstar), Matsushita (Panasonic, Quasar), Microsoft Corp., Mitsubishi, Orion, Philips (Magnavox, Philips), Samsung, Sanyo, Scientific-Atlanta, Sharp, Shintom, Sony, Southern New England Telephone, Thomson Multimedia (GE, Proscan, RCA, Thomson), Time Warner, Toshiba, Uniden and Zenith.

Gemstar has more than 60 issued U.S. patents in the general area of audio-visual technologies with more than 1,000 claims and more than 70 foreign patents with more than 1,000 claims. The company continues to pursue a worldwide patent prosecution program and has more than 130 pending U.S. patent applications and more than 160 pending foreign patent applications.

Gemstar's VCR Plus+ instant programming system is a world standard for VCR programming. VCR Plus+ allows a user to record a television show simply by entering a number -- the PlusCode number printed in television program guides. The PlusCode numbers are published by more than 1,800 newspapers and television program guides worldwide, with a combined circulation of more than 330 million.

The VCR Plus+ system has been licensed to virtually every major television and VCR manufacturer and is now available in 40 countries and 6 continents, including the United States, Canada, United Kingdom, Continental Europe, Japan, Southeast Asia, Australia, New Zealand, South America and South Africa.

Gemstar is a leading provider of electronic program guide services, which allow a user to view a television



program guide on screen, obtain details about a show, sort shows by themes or categories, and select shows for tuning or recording, all through the remote control.

In the United States, data for Gemstar's electronic program guide services are carried on the ABC, Fox, CBS, NBC, UPN and PBS networks by hundreds of over-the-air broadcast stations and on a number of cable networks. Gemstar's electronic program guide has been built into a number of models of new televisions, VCRs and TV/VCR combination units.

Gemstar's electronic program guide is also licensed to cable, telco and MMDS service providers, and has been integrated into direct broadcast satellite receivers, digital and advanced analog cable set-top boxes, PCTV, Internet devices and computer operating systems such as Windows 98.

This news release contains forward-looking statements which involve risks and uncertainties, some of which are discussed from time to time in the company's reports on file with the Securities and Exchange Commission. The company's actual results in the future may differ significantly from the results discussed in the forward-looking statements.

Note to Editors: GUIDE Plus+, INDEX Plus+, VCR Plus+ and PlusCode are registered trademarks of Gemstar. Other product names used herein are for identification purposes only and may be trademarks of their respective companies.

       CONTACT:   Gemstar International Group Ltd.
                  Sallie Manson, 626/792-5700

*Quote for referenced ticker symbols:* GMSTF, GIC

© 1998, Business Wire

---

For more on Quicken.com:

    ^ Select a Department - ▼

**Trade and shop online with our sponsors**

  Vanguard

DLJdirect          Ameritrade®          Vanguard

© 1997-1998 Intuit Inc. Trademark Notices
By accessing and using this page you agree to the Terms of Service.
Learn how important your privacy is to us.

**YAHOO!FINANCE**  Home - Yahoo! - Help   **BUSINESS WIRE**

Earn points for free merchandise
from CDnow, Amazon.com,
Sharper Image, and more!

[ Business | US Market | By Industry | IPO | AP | S&P | International |
PRNews | BizWire ]

Tuesday December 1, 3:55 pm Eastern Time

Company Press Release



Related Quotes
| | | |
|---|---|---|
| GMSTF | 66 1/8 | +0 |
| PIO | 16 13/16 | +0 |

delayed 20 mins –
disclaimer

# Gemstar Files Patent-Infringement Suit Against Pioneer

PASADENA, Calif.--(BUSINESS WIRE)--Dec. 1, 1998--Gemstar
International Group Ltd. (Nasdaq:GMSTF - news) Tuesday announced that
it has filed a patent-infringement suit against Pioneer Electronics Corp.
(NYSE:PIO - news), Pioneer North America Inc. and Pioneer New Media
Technologies Inc. in the Federal District Court, Central District of
California.

The suit claims, among other matters, that Pioneer willfully infringed
certain Gemstar intellectual property, specifically two of the so-called
Levine patents, by virtue of Pioneer's deployment, marketing, offers to sell
and sale of its cable set-top boxes containing an unlicensed interactive
program guide.

The Levine patents broadly cover, among others, an interactive program
guide using locally stored or cached data. Gemstar is seeking an injunction
and monetary damages.

``Gemstar continues its policy of vigorously enforcing its intellectual
property,'' said Henry C. Yuen, chief executive officer of Gemstar.
``Gemstar will diligently prosecute infringers of its patents, trademarks,
copyrights and other intellectual property, and will seek redress to the
fullest extent of the law.''

Gemstar develops, markets and licenses proprietary technologies and
systems aimed at making technology user-friendly for consumers.

http://biz.yahoo.com/bw/981201/gemstar_in_1.html                    12/3/98



Gemstar's technology and intellectual property are licensed to major companies in the consumer-electronics, satellite, cable and personal-computer industries, including Aiwa, Akai, Cox, Daewoo, Funai, GTE, Hitachi, Hughes Network Systems, JVC, LG Electronics (Goldstar), Matsushita (Panasonic, Quasar), Microsoft Corp., Mitsubishi, Orion, Philips (Magnavox, Philips), Samsung, Sanyo, Scientific-Atlanta, Sharp, Shintom, Sony, Southern New England Telephone, Thomson Multimedia (GE, Proscan, RCA, Thomson), Time Warner, Toshiba, Uniden and Zenith.

Gemstar has more than 60 issued U.S. patents in the general area of audiovisual technologies with more than 1,000 claims, and more than 70 foreign patents with more than 1,000 claims. The company continues to pursue a worldwide patent-prosecution program and has more than 130 pending U.S. patent applications and more than 160 pending foreign patent applications.

Gemstar's VCR Plus+ instant programming system is a world standard for VCR programming. VCR Plus+ allows a user to record a television show simply by entering a number – the PlusCode number – printed in television-program guides. The PlusCode numbers are published by more than 1,800 newspapers and television-program guides worldwide, with a combined circulation of more than 330 million.

The VCR Plus+ system has been licensed to virtually every major television and VCR manufacturer and is now available in 40 countries and on six continents, including the United States, Canada, the United Kingdom, Continental Europe, Japan, Southeast Asia, Australia, New Zealand, South America and South Africa.

Gemstar is a leading provider of electronic program-guide services, which allow a user to view a television-program guide on-screen, obtain details about a show, sort shows by themes or categories, and select shows for tuning or recording, all through the remote control.

In the United States, data for Gemstar's electronic program-guide services are carried on the ABC, Fox, CBS, NBC, UPN and PBS networks by hundreds of over-the-air broadcast stations and on a number of cable networks.

Gemstar's electronic program guide has been built into a number of models of new televisions, VCRs and TV/VCR combination units. Gemstar's electronic program guide is also licensed to cable, telco and MMDS service



# EXHIBIT / ATTACHMENT

B

(To be scanned in place of tab)

## ASSIGNMENT AND AGREEMENT

For and in consideration of the sum of One Dollar to me in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, I, **EDWARD J. NEIL**, have sold, assigned and transferred, and do hereby sell, assign and transfer, unto **Scientific-Atlanta, Inc.**, a corporation of the State of Georgia, having its principal office in Lawrenceville, State of Georgia, United States of America, and its successors, assigns, and legal representatives, the entire right, title and interest for the United States of America in and to certain inventions relating to improvements as described, illustrated and claimed in United States of America Patent No. 4,706,121, together with the entire right, title and interest in and to said Letters Patent, along with the entire right, title and interest in and to any Letters Patent which have been or may be issued upon any division, extension, continuation, re-examination or reissue thereof.

I further do hereby sell, assign and transfer, unto **Scientific-Atlanta, Inc.**, all right, title and interest to sue or proceed against any party for any cause of action related to or arising out of United States Patent No. 4,706,121 and any Letters Patent that may issue from that patent including but not limited to non-joinder of inventor. The right to sue or proceed against any party includes the right to proceed against a party for any liability attributable to the past, present or future infringement of United States Patent No. 4,706,121 and any Letters Patent that may issue from that patent. I hereby release **Scientific-Atlanta, Inc.** from any liability attributable to or arising out of United States Patent No. 4,706,121 and any Letters Patent that may issue from that patent.

I hereby also sell, assign and transfer unto **Scientific-Atlanta, Inc.**, the entire right, title and interest in and to said invention and in and to applications for Letters Patent therefor in all countries foreign to the United States of America, including all rights under any and all international conventions and treaties in respect of said invention and said applications for Letters Patent in foreign countries, and I further authorize **Scientific-Atlanta, Inc.**, to apply for Letters Patent in foreign countries directly in its own name, and to claim priority of the filing date of the said application for Letters Patent of the United States of America under the provisions of any and all international conventions and treaties.

I hereby authorize and request the Commissioner of Patents of the United States of America to issue Letters Patent upon the aforesaid application, division, extension, continuation, re-examination or reissue, to **Scientific-Atlanta, Inc.**, for the sole use and behalf of **Scientific-Atlanta, Inc.**, its successors, assigns and legal representatives, to the full end of the term for which said Letters Patent may be granted, the same as they would have been held and enjoyed by me had this assignment not been made, and I hereby authorize and

request the equivalent authorities in foreign countries to issue the patents of their respective countries to **Scientific-Atlanta, Inc.**

I agree that, when requested, I will, without charge to **Scientific-Atlanta, Inc.**, but at its expense, sign all papers, take all rightful oaths, and do all acts which may be necessary, desirable or convenient for securing and maintaining patents for said inventions in any and all countries and for vesting title thereto in **Scientific-Atlanta, Inc.**, its successors, assigns and legal representatives or nominees.

I covenant with **Scientific-Atlanta, Inc.**, its successors, assigns and legal representatives, that the interest and property hereby conveyed is not subject to a previous obligation to assign and is free from all prior assignment, grant, mortgage, license or other encumbrance.

_____          _____
            EDWARD J. NEIL                            Oct 14, 2002
                                                         DATE

STATE OF ~~GEORGIA~~ Calif
COUNTY OF Sonoma

I, Leigh Mateas _____, a Notary Public in and for the County and State aforesaid, do hereby certify that the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered said instrument as his free and voluntary act and deed for the uses and purposes therein set forth.

Given under my hand and notarial seal this _14TH_ day of _October_,
2002.

_____
         Notary Public Signature

OFFICIAL SEAL   1206935
LEIGH MATEAS
NOTARY PUBLIC - CALIF.
COUNTY OF SONOMA
My Comm. Exp. Dec. 24, 2002

## CERTIFICATE OF SERVICE

This is to certify that I have this date served counsel for all parties to this action with a copy of the foregoing FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF as follows:

### *Via Hand Delivery*:

John L. North, Esq.
SUTHERLAND, ASBILL
  & BRENNAN LLP
999 Peachtree Street, N.E.
Atlanta, Georgia  30303-3996

### *Via U.P.S. Overnight Delivery*:

Steuart H. Thomsen, Esq.
SUTHERLAND, ASBILL
  & BRENNAN LLP
1275 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2415

Richard G. Parker, Esq.
O'MELVENY & MYERS LLP
555 Thirteenth Street, N.W.
Suite 500 West
Washington, D.C.  20004-1109

Duane H. Mathiowetz, Esq.
TOWNSEND & TOWNSEND & CREW
Two Embarcadero Center
8th Floor
San Francisco, California  94111-3834

This ___21st___ day of January, 2003.

_____
Matthew C. Gaudet